NEW JERSEY INDEMNITY COMPANY, complainant.

*v.*

EDWARD M. CARROLL et al., defendants.

———

EDWARD M. CARROLL et al., complainants,

*v.*

NEW JERSEY INDEMNITY COMPANY, defendant.

[Decided July 18th, 1924.]

Insurance—Reciprocal—Exceptions to Master's Report—Liability of Insurers Under Contract Limited to Amount Deposited by Them—Claims. for Allowances by Agent of Insurers—Expenses of Agent—Question of Settlement on Basis of Premiums Allowed or Premiums Collected—Alleged Knowledge and Acquiescence of Insurers.

On exceptions to master's report.

BUCHANAN, V. C.

These consolidated causes involve the affairs of the New Jersey Indemnity Company acting as attorney in fact for the subscribers to reciprocal insurance designated Motor Car Underwriters and Auto Bus Underwriters. The matters of detailed investigation and accounting were referred to a special master, to whose report the New Jersey Indemnity Company has filed seventeen exceptions, and United Advertising Company has filed an exception which is included in the New Jersey Indemnity Company's exceptions, and need not be separately considered.

1. The first exception is "to the master's finding that under the contract between the New Jersey Indemnity Company and the subscribers, and between the subscribers *inter*

42

*sese,* there can be no assessment, because the liability of the subscribers is limited to the amount deposited by them."

Notwithsanding the able argument of counsel for the New Jersey Indemnity Company, I think the special master was correct in this determination. The scheme was of reciprocal insurance, all policyholders reciprocally insuring each other, with the New Jersey Indemnity Company acting as agent for all, writing the policies, and being the only party with which any policyholder had any direct contact or dealings. The indemnity company had a schedule of rates, under which an estimated premium was computed for each policy, which they called a "premium deposit" in the policy. See *Exhibits C-3.*

An applicant for insurance presumably was told what "premium deposit" he would have to pay to get his policy (corresponding to the premium paid for insurance in regular stock companies), and was given an "application, agreement and power of attorney" to sign. See *Exhibit C-9.* Until he signed it, he had nothing to do with the scheme; he was neither insurer nor insured. Neither was he insurer or insured immediately upon signing this. Under it he became entitled to receive a contract of insurance "to become effective at noon on the last day of the month;" he authorized the indemnity company to make him liable as insurer of the other policyholders; he bound himself to pay certain moneys, but "this instrument" was not to become effective until the date the policy became effective. See *Exhibit C-9,* next to last paragraph.

The most important provision of this "application," &c., is the second paragraph, which specifies what the applicant authorizes the indemnity company to do in the way of binding the applicant as an insurer, and specifies what the applicant binds himself to do in the way of payments. It reads as follows:

"My attorney shall exchange for me indemnity with other sub-scribers at said exchange, and have full power to do or perform every act I myself could do in relation to any such contracts of indemnity, including the appearance for me in actions, suits and proceedings, and the defense, compromise or adjustment of same, provided, however,

that my attorney shall not make me jointly liable with any other subscriber, but shall bind me separately and for myself alone, and for not more than one annual premium deposit on any one contract, which amount I hereby subscribe for the payment of excess losses, subject to the call of the board of trustees."

It will be noted that it specifically provides that the indemnity company "shall bind me * * * for *not more than one annual premium deposit, * * * which amount I hereby subscribe* for the payment of excess losses, subject to the call of the board of trustees." He did not pay the "annual premium deposit" when he signed this application; he paid that (or gave a note for it) when he got his contract; all he did was to "subscribe" it, promise to pay it at the call of the board of trustees.

What "the call of the board of trustees" actually meant in practice does not appear. By clause "Q" of the policy contract the "subscriber agrees to advance for his credit with the attorney at the exchange ........ dollars, for the purpose of exchanging indemnity * * *. Unless this amount is paid in full within thirty days" the contract shall be void. (From the aggregate of these "advances" the agent was to pay expenses and losses as they occurred.) It seems clear that the subscriber's "advances" and his "premium deposit" were one and the same thing. See, also, clause "O" of the contract. Indeed, this indubitably appears from the Ford special sample policy (part of *Exhibit C-3*), which specifies "premium deposit $57.70" at the top of first page, and also in item 13 of the warranties, and specifies $57.70 as the "subscriber's advance" in clause "Q."

It is probable, therefore, that the "call of the board of trustees" had been reduced to practice as "payment on delivery of the policy, or within thirty days." In any event, however, the applicant, as I have shown, bound himself only for one annual premium deposit or advance, and not more, and provided that the agent should not bind him for any more. That was specifically his total liability for losses, whether such losses were "excess" or otherwise. I do not understand why the word "excess" was used, but assuredly there is no provi-

sion for any liability or assumption of liability for losses which were not "excess" losses.

Moreover, the policy contract provides, at the very beginning, that the other reciprocal insurers agree to indemnify the policyholder "in consideration of the premium deposit herein provided." Nothing is said as to there being any assumption of liability for future possible payments, as consideration.

There is not the slightest doubt in my mind but that a policyholder or applicant understood, and was justified in understanding, from all that appears in the application and policy, that the specified advance or premium deposit was the maximum amount that he would be called upon to pay.

Clause "O" of the policy does not afford any basis for argument either way. It reads as follows:

"O. The subscribers at the Motor Car Underwriters, herein called 'exchange,' are individuals, firms and corporations that have each executed an agreement [hereby made a part hereof], which vests in the New Jersey Indemnity Company, herein called 'attorney,' power to issue this contract for them. It is understood and agreed that there is assumed by each subscriber, as if a separate contract were issued therefor, a sum which is the same proportion of the aggregate liability hereunder that each subscriber's advances bears to the aggregate of all subscriber's advances under all contracts in effect at the time of loss."

It is evident that this clause (except for its reference to the "agreement," which presumably means the "application, agreement and power of attorney" hereinbefore mentioned) contains no *limitation whatever* upon a subscriber's total liability for the losses of other policyholders. All that it limits is his proportion of each loss. The only limitation upon his total losses is that provided in the "application, agreement and power of attorney." Suppose there were four thousand policyholders, who had paid a total aggregate of premium deposits of $200,000, policyholder A having paid $50. If policyholder Z has a loss of $4,000, A's share, under the language of clause "O," would be 50/200,000 or 1/4,000 of $4,000, or one dollar. But if five hundred policyholders

should have losses of $4,000 each, then A's total liability under clause "O" alone, would be $500.

It is argued by counsel for the indemnity company that the provisions of the contract are ambiguous as to whether the subscriber is liable to make an additional payment not exceeding the amount of his premium deposit, to pay losses in excess of those anticipated or provided for by the premium deposits, and that this ambiguity must be resolved by a construction most strongly against the subscriber in his capacity as insurer. With this I cannot agree. Taking the application and contract all in all, I have no doubt that each subscriber's or policyholder's liability is limited to the amount of premium deposit stated in his policy, as I have already indicated.

Even if this were not so, whatever ambiguity existed cannot be charged to a subscriber more as insurer than insured. He became insurer and insured at one and the same time— and indeed it was his principal object to become insured. The responsibility for the ambiguities must rest upon the New Jersey Indemnity Company, for it was that company which drafted the agreements and contracts; it was that company which fathered and instituted the whole scheme, and, of course, obviously did it principally for its own benefit, for the sake of the profits which it would derive from acting as agent; it was that company which solicited the subscribers to become such; it was that company which to the minds of the public was practically the actual insurer, and was held liable as such in *Solomon* v. *New Jersey Indemnity Co., 94 N. J. Law 318; affirmed, 95 N. J. Law 545.*

It is impossible to escape the suspicion, if not indeed the conviction, that the provisions of the agreement and policy were purposely made ambiguous and uncertain. They were evidently drawn with care, and it would have been perfectly easy to have made the matter plain and certain, with only a few words. There may be observed in this connection, the fact that clause "O" of the policy, which is the vital part, providing for the liability of the co-insurer, bears the astonishing and utterly misleading bold-face title or caption "Definitions."

2. The second exception is "to the master's refusal to allow to the New Jersey Indemnity Company moneys paid for furniture and other items prior to the commencement of business of the New Jersey Indemnity Exchange."

I see no reason to disturb the special master's determination. He held that these moneys paid out prior to the commencement of business of the "exchange" were expenses of the indemnity company, and such they seem to me clearly to be.

Reference may be made again to the fact that this scheme of reciprocal insurance was the scheme of the indemnity company, gotten up by it primarily for its own benefit. It was not the case of an existing body of reciprocal insurers, or intending reciprocal insurers, calling on or negotiating with the indemnity company to act as their agent. There were no insurers until the indemnity company, by its solicitation and advertising (done as I have said primarily for its own benefit and profit), called them into being. Its expenditures prior to that time were its own expenditures.

It is argued that the subscribers authorized the indemnity company to charge these expenditures against them, by the fifth paragraph of the "application, agreement and power of attorney," wherein it is provided:

"* * * My attorney shall pay out of my funds my proportion of the necessary expenses and of the cost of any and all claims or demands, as adjusted, contested, compromised or reduced to judgment. In full consideration for their services, and the payment by them of all clerical help and office rent, my attorney is authorized to retain twenty-five per cent. of all deposits of money made by me with the Motor Bus Underwriters at New Jersey Indemnity Exchange."

It is said these expenditures come within "necessary expenses. I do not agree. *Prima facie,* in this agreement, which was drafted by the indemnity company, which occupied a fiduciary relationship toward the subscribers, "necessary expenses" means the necessary future expenses in carrying on the business of the agency. Assuming for the sake of the argument that the cost of furniture in future would be chargeable to the subscribers, as part of the "necessary ex-

penses," it is certainly not thereby indicated that the expenditures already made by the indemnity company, to produce a plant (which they had to have in order to induce persons to come into their scheme and become subscribers and furnish them with profits), were to be paid for by these unwitting victims. Reading this clause arouses again the belief that it was cunningly contrived and worded so as to induce the belief in the minds of the subscribers, that twenty-five per cent. of the premium deposits and no more, was all that would go directly or indirectly to the indemnity company for its services or its expenses in rendering those services.

It appears that some of this furniture bought by the indemnity company prior to the commencement of business was sold by the receiver for the reciprocal insurers, he receiving $807 in payment therefor. This was erroneous on the part of the receiver, but a natural error, undoubtedly induced by statements of the indemnity company (to the same effect as the argument now made here) that it was the property of the insurers. The indemnity company is entitled to reimbursement from the receiver, and the special master has properly credited the indemnity company with the $807 received by the receiver. There is no claim that it was worth more.

3. The third exception is "to the master's refusal to allow to the New Jersey Indemnity Company moneys paid by the New Jersey Indemnity Company for re-insurance amounting to the sum of $12,716.66."

Here, again, I think the special master's finding must be sustained. Counsel for the indemnity company puts forward an argument which at first impression has some appeal, to wit, that this reinsurance was for the benefit and protection of the reciprocal insurers; that it was reinsurance of certain risks as to which there were only a comparatively few policyholders, and as to which, therefore, the risk of loss was too dangerously high unless they were reinsured with another or other concerns.

Recognizing and conceding this, however, it still remains true that the indemnity company is not entitled to credit

for unauthorized expenditures out of the subscribers' funds, and I can find no authority from the subscribers for these expenditures. The "application, agreement and power of attorney," signed by the respective subscribers, gives—and correspondingly limits—the right of the indemnity company as agent to disburse the trust funds received from the subscribers. It commences with a preamble or preliminary agreement, to the effect that the subscribers agree with each other to secure protection against loss and *"to obtain such indemnity by the exchange of private contracts."* The second paragraph (hereinbefore quoted) authorizes the indemnity company as agent "to exchange indemnity with other subscribers," and gives it "full power to do or perform every act I myself could do in relation to any *such* contracts of indemnity." It is this last clause on which the exceptant relies as conferring blanket powers and authority—overlooking the controlling and limiting significance of the word *"such,"* which clearly refers only to the exchange of private contracts of indemnity therein before mentioned.

The only other clause which might be applicable is the fifth paragraph (also hereinbefore quoted), authorizing the indemnity company to pay out "necessary expenses." But here again the "necessary expenses" must be read in conjunction with the whole agreement, and when so read, must clearly be limited to the expenses of exchanging private contracts and adjusting losses thereunder. There is no provision, express or implied, authorizing the indemnity company to reinsure.

4. The fourth exception is "to the master's conclusion that the account between the New Jersey Indemnity Company and the subscribers should be settled upon the basis of premiums charged, and not upon the basis of premiums uncollected, and to the master's holding that the New Jersey Indemnity Company is liable for premiums uncollected."

The indemnity company's contention is that, under this scheme of reciprocal insurance, the liability of the subscribers was to each other, and not to the indemnity company, except as agent for the subscribers; and further, that by the applica-

tion, agreement and power of attorney, the indemnity company was fully authorized, under the blanket power granted, to extend credit to the subscriber-policyholder for the amount of his premium deposit.

Both of these propositions are doubtless true, but the conclusion which counsel seeks to draw therefrom is a *non sequitur;* and this for the reason that in this argument the duty and liability of the indemnity company (as agent) to the subscribers is overlooked, the agent was a fiduciary to the subscribers in respect to the powers delegated to it, and the more unlimited the agent's powers, the greater the duty of the agent in the exercise thereof.

As I have said before, it was the indemnity company which instituted this scheme of insurance, and which invited and induced the subscribers to enter into it. It, of course, represented to the prospective subscribers that it was a sound, feasible, money-saving scheme of insurance for them, and that it, the indemnity company (which was asking the subscribers to let it act as agent for them and get a twenty-five per cent. commission), was a capable agent to act for them in the scheme and to manage the entire proposition. Its duty, of course, was to manage the business properly and safely for the benefit of, and in the interests of, the subscribers.

Now, it is perfectly obvious that a reciprocal system of insurance would be utterly impractical, if the subscribers put up no money in advance—if each time a loss occurred the agent had to collect the amount for some thousands of subscribers in portions of a dollar or a fraction thereof from each. It was imperative that premium deposits be made, so as to eliminate the staggering costs of such piece-meal collections. It was the duty of the indemnity company, therefore, not only to provide that such premium deposits be made by the subscribers, but also to see that they were actually paid in.

This duty it recognized to a certain extent, at least, as is evident from the provision in the policies (clause Q) that the premium deposits must be paid in full within thirty days,

or the policy shall be void from the beginning. This duty, however, it failed to perform, as it failed to perform so many other duties—such as the failure to give bond, its failure to keep separate accounts of the subscribers' moneys, its mingling of the subscribers' funds with funds of the State Mutual Company and others of which it was also agent or attorney in fact, its misuse of subscribers' fund (even though later returned) in purchasing a building, its saddling every conceivable item of expense possible upon the subscribers instead of itself, its apparently intentional lack of clarity in its contracts and agreements, and many others.

In my opinion, in view of its solicitation of subscribers and representation as to the scheme of insurance and its ability to manage the same, it was the duty of this agent to its subscribers to collect the premium deposit from each subscriber on the issuance of each policy; and its failure so to do is negligence and misuse of its trust powers, which would make it liable to the body of subscribers for the premiums uncollected. It perhaps is unnecessary, in the present instance, to go quite that far, for, as I have said, the policies require the premiums to be paid within thirty days, and the indemnity company did not perform the duty thus recognized, of collecting within thirty days or canceling the policies, but extended credit for ninety days and upwards, and took notes.

For these premiums I think the indemnity company is properly chargeable, and the master has correctly debited it with these amounts.

The indemnity company also seeks to spell out an estoppel against the subscribers with regard to this liability, arising out of an alleged knowledge and acquiescence—(1) by the subscribers themselves, and (2) by the board of trustees, and another estoppel arising out of the fact that the receiver took over the accounts due from subscribers for uncollected premiums and tried to collect them.

In the first place, it does not appear by the evidence that all or even the majority of subscribers had this improper credit extended to them by the company. Moreover, even if they had, such an experience by each subscriber was not

·knowledge by him that it was being done in the case of all subscribers, much less that it was being done in the name and at the risk of the subscribers instead of as a matter between the subscriber and the agent and at the risk of the agent only.

In the second place, as to the board of trustees, the evidence shows that only one or two of the board of trustees knew of the practice. But even supposing that all of them had known, I can see nothing which would make this knowledge binding or effective as against the subscribers. There is nothing in the application, agreement and power of attorney which provides or operates in any such way. So far as I am able to perceive from this instrument, the "board of trustees" was a mere form of words, a dummy set up for the purpose of inspiring confidence in the persons solicited to become subscribers. It was to be a board of five to fifteen members, not *elected* by the subscribers, but *selected* by the indemnity company from amongst the subscribers. "The attorney is authorized to ask subscribers whom they desire to serve on such board." This approaches the domain of pure humor. The attorney was in nowise bound to heed such requests, and it appears from the evidence that in fact many or most of the trustees were employes of the attorney, the indemnity company. And the only powers given to this "board" were the approval of the location of the agent's place of business; the "call for subscriptions" (whatever that meant, which is not specified and does not otherwise appear) ; the approval of securites in which subscribers' funds were to be invested, and the fixing of the amount of, and approval of, the bond which the indemnity company was required to give. There is nothing which constitutes the "board" a body representative of the subscribers, in anywise like a board of directors, nor in anywise like an ordinary board of trustees—the agent was itself the trustee. It is interesting to note that in the answer of the indemnity company to the bill filed by the "board of trustees," the indemnity company denies "that the complainants are trustees for the subscribers, or that they are

subscribers, or that they have any right to represent subscribers."

Nor am I impressed with the argument that the receiver took over the uncollected premium accounts. The receiver was appointed by this court to wind up the affairs of this reciprocal insurance scheme at the instance and solicitation of the agent, and because it was unable itself so to do, and the receiver took over and undertook the collection of these unpaid premium accounts at the instance of and with the consent of the agent. Indeed, it may well be that one of the reasons for the action of the indemnity company in this behalf, was the thought that it might thus escape liability. But, in any event, the taking over of these accounts by the receiver was proper. The liability of each subscriber is to the subscribers as a body, and hence to the receiver, not to the agent. The agent's liability, as I have said, arises from it wrongful act in misusing its trust powers to the detriment of its *cestuis que trustent,* in the improper extension of these credits.

This exception will be overruled.

5. The fifth exception is "to the master's allowance of the claims of subscribers for premiums as follows: Anthony T. Zwack, Rufus M. Travers, Charles J. Eymer, Walter Nemethy, D. Farbane and Charles Krauss."

This exception must also be overruled. The claims in question were by subscribers for the return of the "unearned" portion of their premium deposits. Their right to this is specifically provided in the seventh paragraph of the "application, agreement and power of attorney," which provides that, on notice of cancellation, the indemnity company "shall cancel all unexpired insurance granted by me through them * * * , liquidate my account, and return to me my net surplus and unused advances." It is also provided in clause "J" of the policy.

The ground of the exception is not a dispute of this right, nor of the amounts due to these subscribers, but is a corollary of the contention put forward in support of the first exception. In other words, the exceptant's position is that

all the subscribers are liable to an extra assessment, and that the claims of these subscribers for return of unearned premium should be withheld or postponed in order that there may be a set-off as against such extra assessment when made.

In view of the conclusion reached on the first exception, that there is no liability of any subscriber for extra assessment, this fifth exception necessarily fails.

6. The sixth exception is "to the master's allowance of the claim of Watson Trucking Company for $626.38."

This claim of Watson Trucking Company was for a loss by fire. The indemnity company contends that there was no evidence of the filing of proof of loss as required by the policy. The provision of the policy, however, though printed under the head of "Conditions," does not specifically make the filing of the proof of loss a condition precedent to the right of recover under the policy. Many of the provisions printed under that head obviously are not conditions. There was some proof before the master that a proof of loss was filed (page 275 of the testimony), and there was no contradiction. This exception will be overruled.

7. The seventh exception is "to the master's allowance of the claim of Charles Schneider, Inc., $560."

The exceptant, in its brief, "withdraws" this exception. The report of the special master will be confirmed as to this item.

8. The eight exception is "to the master's allowance of the claim of Abraham Duff, $1,623.10."

The claim of Abraham Duff is for moneys paid by the insured in settlement of a claim by a third party against him for damages. Under the policy provisions the insured has no claim in such a case unless the settlement was authorized or ratified by the insurers. There is no proof at all of any such authorization or ratification.

This exception must be sustained.

8a. Exception eight (a) is as follows: "To the master's allowance of the claim of the Watson Trucking Company, $611.88."

This claim of Watson Trucking Company is for legal expenses and counsel fees incurred in defending a suit for damages for an accident covered by a policy (being the suit resulting in the judgment referred to in the exception 9). The policy binds the insurers to defend such suits for the insured. The insurers did not so defend this suit, because the receiver had been appointed in this cause before the suit was commenced. The claim was properly allowed, although, when the matter of distribution is up for determination, it may be that this claim will fall in a different class from some of the other claims.

The exception will be overruled.

9. The ninth exception is "to the master's allowance of the claim of Anna Redman, administratrix *ad pros.*, $5,000."

This exception must be sustained. The allowance of the claim in this form was evidently an inadvertence on the part of the special master. Anna Redman, administratrix, was not, nor was her intestate, a policyholder. Her intestate was killed by Watson Trucking Company, which was a policyholder. She sued and recovered judgment against Watson Trucking Company for $6,000 damages. The limit of liability of the subscribers to Watson Trucking Company under its policy was $5,000, and that liability does not accrue until the Watson Trucking Company shall have paid the judgment in question. The allowance of claim in favor of Anna Redman would seem mistaken. The allowance should be to Watson Trucking Company as against the subscribers or their receiver, and only as a *contingent* claim—contingent upon its paying the judgment, or $5,000 thereof.

10. The tenth exception is "to the master's disallowance of the claim of the United Advertising Company, $1,469.17."

This claim of the United Advertising Company was for advertising, soliciting additional policyholders or subscribers to the co-insurance scheme, and was done under a contract with the indemnity company as attorney in fact of the subscribers. The question is therefore whether or not the indemnity company was authorized by the subscribers to incur this liability on their behalf.

The indemnity company contends that such power is given by the subscribers under those provisions of the application, agreement, &c., already referred to—the blanket authority to do every act the subscriber might do in relation to reciprocal contracts of indemnity, and the "necessary expenses" provision. It is further argued, and to some extent justly, I think, that this was a necessary and proper expense of carrying on this business for the subscribers, inasmuch as the greater the number of subscribers secured the lower the cost of the insurance would be to them, and, indeed, unless a proper number were secured the scheme must inevitably fail.

On the other hand, it cannot be overlooked that the indemnity company would profit by these additional subscribers secured by this advertising, to the extent of twenty-five per cent. of the premiums paid by them, and that the whole scheme was concocted and put into operation by the indemnity company in order to get this twenty-five per cent., and that the indemnity company was a fiduciary.

My conclusion is that the claim should have been allowed in part—that is to say, seventy-five per cent. thereof, as against the subscribers or their receiver, leaving twenty-five per cent. to be borne by the indemnity company.

11. The eleventh exception is "to the master's disallowance of the claim of the New Jersey Indemnity Company, $1,476.68."

The special master disallowed this claim for want or insufficiency of proof in several respects, and the record sustains him.

The exception will be overruled.

12. The twelfth exception is "to the master's disallowance of the claim of John Warren, $1,500."

Mr. Warren's claim was for legal services performed for, and at the instance of, the New Jersey Indemnity Company in and about defending the suit brought by the state banking commission against the New Jersey Indemnity Company, to enjoin the issuance by it of reciprocal insurance policies, and in and about advising the officers of the New Jersey

Indemnity Company from time to time in the conduct of the business.

I agree with the special master that this claim cannot be sustained as valid as against the subscribers. I do not see that either the second or fifth paragraphs of the application, agreement and power of attorney authorizes the indemnity company to incur such expense as this on behalf of the subscribers or to charge it against them. In view of what has already been said herein along similar lines, it will be unnecessary to go further into detail except to repeat that the scheme was the scheme of the indemnity company, instituted by it for its own benefit primarily; the contracts were its contracts, and must be construed most strongly against it; the authorization and grant of power in the second paragraph of the "application" is limited to matters relating to the exchange of contracts and the defense of suits under contracts, and "necessary expenses" under the fifth paragraph are likewise so limited.

It may very well be that an injunction against the indemnity company issuing reciprocal policies as attorney in fact would have harmed the subscribers as well as the indemnity company, but that fact does not show any authorization for incurring the charge in question. The indemnity company in starting this scheme and inviting and inducing persons to become subscribers, impliedly represented to the subscribers that it was a lawful project, and I can see no reason why the subscribers should be charged with the defense of the suit brought against the indemnity company, challenging its right to conduct the business which it was in fact conducting.

As to the advice to the officers in the conduct of the business—this I think is clearly a matter of expense to the indemnity company alone, covered as far as the subscribers are concerned by the twenty-five per cent. of premiums given the indemnity company "in full consideration for its services." There is surely an implied warranty that the indemnity company knows how to perform those services, and legal advice in that behalf is at its own expense.

This exception will be overruled.

13. The thirteenth exception is "to the master's refusal to find that there was due from the subscribers to the New Jersey Indemnity Company upon the account of moneys collected and disbursed, $22,636.03."

In other words, this is an allegation that the special master erred in not accepting as and for the accounting which he was directed to make (or as and for a part of such accounting) a statement of account between the indemnity company and the subscribers as made up by the indemnity company. The determination of the special master that this was not a correct statement of the accounts between the parties, and that he could not adopt it as such, as a whole, but must himself state the account, was based in part upon matters of conflicting evidence and testimony and of credibility of witnesses. That alone affords a sufficient reason why this exception should be overruled, and, of course, the sustaining of other particular exceptions to the master's report and account would also necessarily result in the overruling of this comprehensive, general exception. Mention may also be made of the accountant's naive and illuminating testimony (at *p. 11*) that, as to all the expenditures of the indemnity company, he "followed the power of attorney by charging everything except clerical help and rent" to the subscribers.

14. The fourteenth exception is "to the master's refusal to allow to the New Jersey Indemnity Company moneys expended by the New Jersey Indemnity Company since that date."

"Since that date" is elucidated by the exceptant's brief as meaning since the date of the appointment of the receiver. The items and amounts which are intended to be covered by this exception are listed in the brief in conjunction with the items and amounts intended to be covered by the sixteenth exception.

16. The sixteenth exception is "to the master's refusal to allow to the New Jersey Indemnity Company an amount sufficient to liquidate the claims not allowed, but which are contingent, to wit, $6,000 for the Watson Trucking Com-

43

pany, Ash Advertising Company, Kostander, Gray Burial Company, Fortunato claim, amounting, approximately, to the sum of $6,000; claim of the receiver of New Jersey Indemnity Company for assessment, $5,000; amounts referred to on page 45 of the testimony; amount sufficient to cover contingencies, approximately the sum of $25,000."

Under these two exceptions, the fourteenth and sixteenth, the exceptant's brief lists the following eleven items:

| | |
|---|---:|
| Ash Advertising Co. | $2,510.93 |
| United Advertising Co. | 1,296.00 |
| Louis Schneider, Inc. | 550.00 |
| John Francis Cahill | 1,420.00 |
| John Warren | 2,820.74 |
| Claims adjusted and not paid | 2,849.92 |
| Paid for expenses about claim | 3,000.00 |
| Gray Burial Co. | 1,123.66 |
| Kostander | 1,500.00 |
| Fortunato | 500.00 |
| Contingent claims | 25,000.00 |

The only evidence before the master as to the Ash Advertising Company item was oral testimony by the treasurer of the indemnity company (at *p. 45*) that the Ash company "has a bill for $2,510.93 * * * for advertising under contract made by the New Jersey Indemnity Company, attorney in fact, for the Motor Car Underwriters," and that the indemnity company "is now being sued on that contract." The contract was not produced, nor any proof as to what advertising was to be done under it, nor any proof of any work done by the Ash company under the contract, nor that the indemnity company—much less the subscribers—are liable for the amount of the bill or any part of it. The master properly refused to allow the indemnity company a credit, either actual or contingent, against the receiver in respect of this item.

Practically the same thing is true as to the evidence (at *p. 45*) in regard to the bill of United Advertising Company, $1,296. The master properly refused credit, actual or contingent, in favor of the indemnity company against the receiver as to this item.

The Louis Schneider, Inc., $550 claim is a bill or claim by a policyholder in respect of a judgment obtained against him for an accident covered by his policy, plus counsel fees (see *pp. 45, 223, 232*). It is apparently a proper claim, by the policyholder against the receiver, at least, in part, and claim was presented by the policyholder to the receiver in respect thereof and apparently allowed. The policyholder is enjoined from suing the indemnity company, and the master properly refused credit of the item to the indemnity company as against the receiver, either actual or contingent.

As to the John Francis Cahill $1,420 item, the only evidence is (at *p. 46*) that "he has a bill of $1,420 for court costs and filing fees for * * * fifty or sixty cases, growing out of the reciprocal exchange system." There is no proof upon which the master would have been justified in allowing the indemnity company a credit, actual or contingent, against the receiver, in respect of this item.

The John Warren claim of $2,820.74 against the indemnity company includes the $1,500 claim which I dealt with under the twelfth exception, and held was properly disallowed as a claim against the receiver. Obviously, of course, the indemnity company is not entitled to a credit against the receiver in respect of this $1,500. The balance of $1,320.74, however, stands on a different footing. The evidence (at *p. 239 et seq.*) shows that this amount was for work on claims or suits by policyholders, and that the items charged were reasonable. No controverting evidence or argument was made as to this. The $1,320.74 is a proper claim by Mr. Warren against the receiver, and was duly presented and proved by him as such, and I presume was allowed (the master disallowed the $1,500 item), but the indemnity company, of course, is not entitled to a credit against the receiver in respect thereof. That would duplicate the item. Mr. Warren knew, of course, that he was acting for the subscribers, and has properly proceeded against the principal instead of the agent.

Claims adjusted and not paid, $2,849.92. This is elucidated by the brief as being "the amount arrived at by the

claim adjuster as being a just amount to settle claims already made," presumably by policyholders, against the indemnity company (see *p. 48*). What those claims are, or by whom made, does not appear. Doubtless some of them at least are claims proved by policyholders against the receiver before the master. In any event the claimants are enjoined from suing the indemnity company, and the latter is not entitled to any credit against the receiver in respect thereof.

Paid for expenses about claims, $3,000. The master properly refused a credit to the indemnity company for this item. There is no proper proof thereof. The evidence is (at *p. 44*) simply that Treasurer Randolph "thinks" it would amount to $3,000.

Gray Burial Company, $1,123.66. This is a claim by a policyholder, and it appears that judgment has been entered against the indemnity company on it, which judgment is being attempted to be opened. A contingent credit should be allowed to the indemnity company in respect of this item, but this contingent credit will not be allowed as an actual credit if the judgment is one which was enjoined under the original restraining order issued in this cause.

Kostander claim, $1,500. The same thing is true of this item, which is a suit by a policyholder against the indemnity company, pending but not tried. A contingent credit should be allowed the indemnity company, but with the same restriction.

Fortunato claim, $500. This is another policyholder's claim. He is enjoined from suing the indemnity company, and his application to this court for modification of the restraint, to permit him to sue the indemnity company, has been denied. He has proved his claim against the receiver. The indemnity company is entitled to no credit for this item, actual or contingent.

Contingent claims, $25,000. This item is in respect of "500 accidents reported, upon which no suits have been brought, but upon which suits may be brought." (See *p. 47*.) In view of the restraining order, no suits can be

brought against the indemnity company on these accidents, and that company is not entitled to any credit, actual or contingent.

It is evident from the foregoing that the fourteenth exception cannot be sustained, nor the sixteenth either, except to the extent of allowing the restricted, contingent credit in respect of the Gray Burial Company and Kostander claims, as above mentioned.

15. The fifteenth exception is "to the master's refusal to allow to the New Jersey Indemnity Company the total of the amount of claims allowed by the master."

The "claims allowed by the master" are presumably those by policyholders against the receiver. Having been presented and proved against the principal (the subscribers), the claimants cannot sue the agent, the indemnity company, and, moreover, they are enjoined from so doing. The indemnity company is entitled to no credit, actual or contingent, in this regard.

17. The seventeenth exception is "to the master's refusal to order an assessment upon the subscribers sufficient to make up the sum necessary to liquidate the indebtedness and contingent indebtedness of the subscribers to the New Jersey Indemnity Company."

This exception will be overruled, for the reasons set forth in the discussion of the first exception.